U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 APR -1 AM 9: 36

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

CHERYL A. SMITH, )
)
    Plaintiff, )
)
v. )   Case No. 2:17-cv-00171
)
SHAW'S SUPERMARKETS, INC., )
)
    Defendant. )

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 32)

Plaintiff Cheryl A. Smith ("Plaintiff") brings this action against Defendant Shaw's Supermarkets, Inc. ("Defendant") alleging a single cause of action for breach of contract. On June 30, 2015, Plaintiff was terminated from her position as Director of the Shaw's Supermarket, Inc. retail store located in Fair Haven, Vermont following an altercation with a customer in which she touched the customer without his consent. Plaintiff asserts that her termination violated Defendant's progressive discipline policy which she claims gave rise to an implied contract of employment.

Pending before the court is a motion for summary judgment filed by Defendant on October 1, 2018. (Doc 32.) On October 22, 2018, Plaintiff opposed the motion. A hearing was held on December 18, 2018, at which time the court took the matter under advisement. On January 3, 2019, Plaintiff filed a revised response to Defendant's statement of undisputed material facts without seeking Defendant's consent or leave from the court to do so. On January 8, 2019, Defendant replied to Plaintiff's revised statement

of undisputed facts, requesting that the court disregard the additional facts submitted therein.[1]

Plaintiff is represented by James G. Levins, III, Esq. Defendant is represented by Martha Van Oot, Esq.

## I. The Undisputed Facts.

Defendant is one of the oldest continuously operated supermarket chains in the United States. It has approximately 150 stores in Maine, New Hampshire, Vermont, Massachusetts, and Rhode Island, and it employs approximately 19,000 people.

Plaintiff was hired by Defendant in March 2001 when Defendant purchased Grand Union, the company which had employed Plaintiff since her graduation from high school in 1979. In late 2007, Plaintiff was promoted to the position of Assistant Store Manager at Defendant's store in Manchester, Vermont. She worked there until November, 2013, when she was promoted to Store Director at Defendant's store in Fair Haven, Vermont. During Plaintiff's tenure at the store in Fair Haven, her direct supervisor was District Manager Bridget O'Reilly.

In late April 2015, Plaintiff took a two-week vacation during which her co-worker Dan Cotter covered her shifts. On Saturday, May 9, 2015, Mr. Cotter emailed Plaintiff, informing her that a Shaw's employee, Leslie Jay Bowen, had a conflict with his supervisor, Andrea Sweeney, about taking time off from work. Plaintiff replied to the email on the same day asking whether Mr. Bowen had reported for his scheduled shift on Friday, May 8, 2015.

Plaintiff returned to work on Monday, May 11, 2015. She was informed that Ms. Sweeney had an argument with Mr. Bowen on Monday, May 4, 2015, and that on May 6, 2015, Ms. Sweeney told Mr. Bowen that he would need to find his own coverage in order

---

[1] As Defendant points out, many of the additional facts included in Plaintiff's revised statement of undisputed facts are not material to the pending motion. Although Plaintiff's approach to filing is not authorized by this court's Local Rules, in light of the preference for adjudication on the merits, the court considered all relevant facts submitted by Plaintiff.

2

to take time off. Plaintiff concluded that Mr. Bowen had voluntarily quit based on the fact that he did not show up for work after the discussion with Ms. Sweeney.

On June 8, 2015, at approximately 3:30 p.m., Mr. Bowen approached the customer service desk at Defendant's store in Fair Haven and asked to speak with Plaintiff. Plaintiff and Mr. Bowen proceeded to an aisle where Mr. Bowen asked Plaintiff why she had not called him. Plaintiff explained that she did not feel she needed to call him as she had "termed [him] as a no call/no show." (Doc. 32-12 at 30.) Mr. Bowen asked Plaintiff whether Ms. Sweeney was correct when she told him that he needed to find coverage in order to take time off to visit a sick family member. Plaintiff told him that she believed that he had simply made a "casual request for the weekend off" and had not requested leave to care for his partner. *Id.* at 31. When Plaintiff said, "Listen Jay," Mr. Bowen became agitated and said "[y]ou're antigay, aren't you?" *Id.* After Mr. Bowen repeated the accusation loudly, Plaintiff stated "[w]e can't continue having this discussion; we need to bring this outside." *Id.* Plaintiff did not call the police or store security.

Plaintiff began walking toward the exit and Mr. Bowen followed closely behind her, pointing his finger at her and continuing to yell loudly that she was anti-gay. Mr. Bowen told Plaintiff that he did not want to go outside with her. When Plaintiff and Mr. Bowen were approximately ten to fifteen feet from the exit, Plaintiff stopped, turned around, raised her hand, placed two fingers on Mr. Bowen's chin, and said in a stern voice: "Jay, this needs to stop; you need to calm down." *Id.* at 33. Plaintiff then turned around and walked outside. Mr. Bowen followed behind her and yelled "I don't like the fact that you touched me[.]" *Id.* at 34. Plaintiff knew that she had made a mistake as soon as Mr. Bowen complained that she had touched him. Once outside, she turned to him and apologized, stating, "I was trying to calm you down; you're becoming extremely hostile." *Id.*

Plaintiff knew she needed to report the incident so she went to her office and attempted to contact Sandra Gilson who works in Shaw's Human Resources Department. When she was unable to reach Ms. Gilson, she contacted Ms. O'Reilly. Ms. O'Reilly asked Plaintiff, "were the police called and was anybody touched?" *Id.* at 35. Plaintiff

3

responded "no" to both inquiries. *Id.* Ms. O'Reilly then told Plaintiff to report the incident to Kim Buschenfeldt in Human Resources and Tim O'Connor in Loss Prevention Control and obtain statements from witnesses. Mr. O'Connor instructed Plaintiff to call the police if Mr. Bowen returned and to complete an online loss prevention form, which she did. Plaintiff did not tell Mr. O'Connor or Ms. Buschenfeldt that she had touched Mr. Bowen. Plaintiff stated that it was only after her husband informed her that businesses often have policies regarding physical contact that she realized that her act of touching Mr. Bowen on the chin might be "more than what [she] perceiv[ed] it as." (Doc. 32-12 at 43.)

On June 10, 2015, Mr. Bowen called Ms. Gilson and reported that Plaintiff had put her hand up to his face and put her thumb under his chin to close his mouth. Mr. Bowen described Plaintiff's touch as an "assault." (Doc. 44-9 at 26.) Ms. Gilson requested that Mr. O'Connor review the footage from security cameras on the day of the incident. Mr. O'Connor opined that the video depicted Plaintiff raising her hand towards Mr. Bowen's face and touching him briefly on the chin.

Mr. O'Connor and Ms. Gilson interviewed Plaintiff on June 19, 2015. In the interview, Plaintiff admitted that she touched Mr. Bowen and that she did not previously disclose this fact. Plaintiff was asked to provide a written statement regarding the incident and she complied with this request. Mr. O'Connor completed his investigation of the incident on June 25, 2015 after interviewing and obtaining statements from other employees. Mr. O'Connor did not interview Mr. Bowen or Ms. Sweeney.

Director of Labor Relations and Employment Law Brian Fitzsimmons made the decision to terminate Plaintiff. The sole ground for Plaintiff's termination was her touching of a customer without his consent. Mr. Fitzsimmons concluded that it was inappropriate and unprofessional for Plaintiff to touch Mr. Bowen, and that if Mr. Bowen had refused to leave the store, the appropriate response would have been to call the police. Plaintiff was informed of her termination on June 30, 2015. A letter addressed to Plaintiff and signed by Ms. O'Reilly stated that Plaintiff's employment was being terminated because her reaction in dealing with Mr. Bowen was "unprofessional and

inappropriate" and she had "violated the Standards of Conduct of Shaw's Supermarkets." *Id.* at 2.

Defendant's Team Member Handbook (the "Handbook") is a forty-seven page document that "contains many of [Defendant's] policies and procedures and explains how [Defendant] operate[s.]" (Doc. 32-10 at 5.) The Handbook contains a provision entitled "At-Will Employment" which states as follows:

> Team Members are employed on an at-will basis, except as provided by written agreement as described below. "At-will employment" means that either the Team Member or the Company may end the employment relationship at any time, either at the Team Member's option or at the Company's option.
>
> This Handbook is not a contract of employment or a guarantee of continued employment. This is not an agreement for employment for any specified period of time and no representative of the Company may enter into any or make any agreement, implied or expressed, for employment other than on an at-will basis.
>
> Only the Chief Executive Officer of the Company has the authority to make an employment agreement for anything other than employment at-will and then only in writing and signed by or duly authorized by the Chief Executive Officer.

*Id.*

A section of the Handbook entitled "Standards of Conduct" provides that employees are expected to conduct themselves in a "safe and ethical manner at all times whether dealing with coworkers, customers, suppliers, or the public in general." *Id.* at 19-20. Employees are further instructed to "[m]aintain a high level of professionalism" and "[t]reat fellow Team Members and Shaw's/Star Market customers with courtesy, dignity, and respect at all times." *Id.* at 20.

The section of the Handbook entitled "Corrective Action" states:

> Shaw's/Star Market recruits and hires Team Members who are qualified for available positions within the Company. As a Shaw's/Star Market Team Member, you are expected to develop and maintain good work habits and acceptable job performance and to comply with all Company policies and rules.

5

> Occasionally, it may be necessary for Shaw's/Star Market to take corrective action that it considers reasonable under the circumstances and at times, to release Team Members from employment. Shaw's/Star Market attempts to resolve workplace issues, including performance concerns, in a fair and timely manner.
>
> Corrective Action is intended to constructively correct behavior that is not meeting Shaw's/Star Market performance expectations. Generally, Shaw's/Star Market will counsel Team Members about ways performance that does not meet expectations can be changed to better contribute to the team. Team Members may receive a notification if performance is unsatisfactory and if so will be informed of specific changes needed to bring performance to acceptable levels on a consistent, going-forward basis.
>
> Shaw's/Star Market generally follows a progressive corrective action process that may include verbal and written warnings, suspension and/or separation of employment. Notwithstanding this general practice, there may be some performance issues and policy violations that are so severe that immediate corrective action including termination may be necessary at Shaw's/Star Market sole discretion. In Shaw's/Star Market sole discretion, it may skip some or all of the steps in the progressive corrective action process (see Reasons for Immediate Termination From Employment below). Shaw's/Star Market reserves the right to determine the appropriateness and level of counseling, or corrective action in each situation, including whether immediate termination of employment is warranted.
>
> These corrective action procedures do not alter the **at-will** employment relationship.

*Id.* at 25 (emphasis in original).

Under the heading "Reasons for Immediate Termination from Employment[,]" the Handbook states: "[w]hile, except as otherwise provided, all Team Members at Shaw's/Star Market are employed at will, which means that either the Company or the Team Member can end their employment at any time, there are certain types of conduct that may warrant immediate discharge from employment." *Id.* Grounds for immediate termination include, but are not limited to:

> Violation of [Shaw's/Star Market's] Courtesy, Dignity and Respect policy, including quarreling or fighting with, threatening, verbally abusing, or unlawfully discriminating against or harassing other Team Members, customers, or vendors, or work-related violence of any sort; . . . [v]iolation

6

of our policy prohibiting [v]iolence in the [w]orkplace; . . . [and] [o]ther conduct which, based on the facts and circumstances, warrants immediate discharge.

*Id.* at 26.

The Handbook contains a policy entitled "Threats and Violence Free Workplace" which provides:

> Any behavior or action that threatens another person's safety, or property, or causes them to perceive their safety or property is threatened, will be thoroughly investigated and if confirmed, will not be tolerated.
>
> Any Team Member who, for any reason, says or does something to threaten another person's safety or property, even in jest, will be subject to corrective action up to and including discharge. Violations of this policy may result in immediate termination of employment without prior warnings.
>
> This policy applies to all statements and acts, even those that are not intended to be harmful, or are intended as jokes or horseplay. This policy also applies to comments or acts that are directed at persons other than Company Team Members.

*Id.* at 24.

Ms. O'Reilly testified as follows regarding Defendant's disciplinary practices:

> [Mr. Levins:] [Is there] anything internally that HR uses or that you would use as a district manager to guide you in how do we discipline an employee and what steps should be taken? . . .
>
> [Ms. O'Reilly:] I'm not sure if this is the copy of the page, but in the handbook that I'm familiar with during my time with Shaw's, there was an outline for progressive discipline. And in my experience, we would work with Human Resources to take guidance from Human Resources.
>
> [Mr. Levins:] Okay.
>
> [Ms. O'Reilly:] In all cases.

(Doc. 34-7 at 14.)

Mr. Fitzsimmons testified that Defendant does not terminate employees for no reason:

> [Mr. Levins:] And this, I mean, have you ever fired someone for no reason at all?

[Mr. Fitzsimmons:] Not for no reason at all.

[Mr. Levins:] In other words, you'd have to have a reason before you terminate someone? . . .

[Mr. Fitzsimmons:] We have a reason for termination if we terminate someone, yes.

[Mr. Levins:] I mean, even if you're of the position that the law allows us to terminate people if we want to, Shaw's wouldn't do that, would they? . . .

[Mr. Fitzsimmons:] We don't generally do that, as far as I know.

(Doc. 34-11 at 14.) Mr. Fitzsimmons also described guidelines that are followed in instances of employee misconduct:

[Mr. Levins:] When an employee is being investigated for alleged misconduct, are there certain guidelines that are followed in the investigation?

[Mr. Fitzsimmons:] The guidelines that, as far as I know, is get the facts of the incident, interview the person involved, if you have any witnesses, that's done by Loss Prevention. That's really the guideline, to get to the facts.

[Mr. Levins:] And once the facts are gathered, what's the next step in terms of guidelines?

[Mr. Fitzsimmons:] Make a decision as to what the appropriate action to be taken is.

[Mr. Levins:] Are these guidelines governing investigation of employee misconduct in writing?

[Mr. Fitzsimmons:] I don't know that there's any specific written guidelines.

[Mr. Levins:] Are there policies and procedures—well, there's a handbook, for example, that's given out to employees, correct?

[Mr. Fitzsimmons:] Correct. Yes.

[Mr. Levins:] Is there a handbook for policies and procedures that are given to an investigator who is called upon to go investigate an allegation of employee misconduct?

[Mr. Fitzsimmons:] I'm not aware of any, but I'm not sure if the Loss Prevention Department has its own[.]

*Id.* at 4-5.

Victoria Pollard, the Fair Haven Customer Service Manager, stated that employees "receive coaching and verbal correction" and that employees are given "quite a few written warnings before termination." (Doc. 34-8 at 28.) With regard to corrective action, Ms. Gilson said that "[i]t would depend on the situation, but normal practices would be a verbal or written warning, a final written warning with or without a suspension, and then . . . there may be a final suspension, and then termination." (Doc. 34-6 at 3.)

## II.     Conclusions of Law and Analysis.

### A.     Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman*

*v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Not all disputes of fact are material – "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Nevertheless, "[t]he function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### B. Whether Defendant's Handbook Created an Implied Contract of Employment Between Plaintiff and Defendant.

Plaintiff contends that by establishing personnel policies, practices, and procedures regarding progressive discipline, Defendant created an implied contract of employment. She further argues that Defendant breached this contract by failing to follow its established progressive discipline policies and procedures in addressing the June 8, 2015 incident. Defendant asserts that its disciplinary policies, as stated in the Handbook and as applied by its managers, did not create an implied contract of employment with Plaintiff. It contends that it is entitled to judgment as a matter of law on Plaintiff's contract claim.

Under Vermont law, when an employee is hired for an indefinite term, the employee is considered at-will unless there is evidence to the contrary. *Dillon v. Champion Jogbra, Inc.*, 819 A.2d 703, 706-07 (Vt. 2002). However, "the presumption that employment for an indefinite term is an 'at-will' agreement is simply a general rule of contract construction" and "when an employer takes steps to give employees the impression of job security and enjoys the attendant benefits that such an atmosphere confers, it should not then be able to disregard its commitments at random." *Id.* (noting that "at-will employment relationships have fallen into disfavor").

10

An employer may modify an at-will employment agreement unilaterally either through its written policies or practices, or both. *Id.* at 707. In this respect, "[a]n employer not only may implicitly bind itself to terminating only for cause through its manual and practices, but may also be bound by a commitment to use only certain procedures in doing so." *Id.* Those procedures, however, must be "definitive in form, communicated to employees, and evince an employer's intent to bind itself." *Havill v. Woodstock Soapstone Co.*, 783 A.2d 423, 428 (Vt. 2001) (citing *Ross v. Times Mirror, Inc.*, 665 A.2d 580, 584 (Vt. 1995)). "The critical inquiry is . . . whether the procedure amounted to an enforceable promise of specific treatment in a specific circumstance." *Ross*, 665 A.2d at 585.

With respect to the Handbook, it is well established that "in the employment context, the long-standing law of contract that the interpretation of *unambiguous* writings is a matter of law for the court, as is the determination of *whether* a writing is ambiguous." *Dillon*, 819 A.2d at 707 (citation omitted). "Only after a determination that the writing is ambiguous should the interpretation of the writing be submitted to the jury." *Id.* at 707-08. Accordingly, "[w]hether an employer's written policies or practices modify the parties' at-will relationship is typically an issue for the court to decide." *Naylor v. Rotech Health Care, Inc.*, 2009 WL 1684493, at *3 (D. Vt. June 16, 2009) (citing *Dillon*, 819 A.2d at 707).

In this case, the Handbook states that "Team Members are employed on an at-will basis, except as provided by written agreement." Under Vermont law, disclaimers that employment is at-will, while relevant, are not dispositive. *See Dillon*, 819 A.2d at 708 (holding that question of at-will status may be ambiguous "even if there is a disclaimer stating employment is at-will, as the presence of such a disclaimer is not dispositive in the determination"); *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1254 (Vt. 1995) ("The mere inclusion of boilerplate language providing that the employee relationship is at will cannot negate any implied contract and procedural protections created by an employee handbook."). Such disclaimers must instead be evaluated "in the

11

context of all the other provisions in the handbooks and any other circumstances bearing on the status of the employment agreement." *Farnum*, 671 A.2d at 1255.

In *Dillon*, the employer set forth "an elaborate system governing employee discipline and discharge[,]" including "three categories of violations of company policy and corresponding actions to be generally taken in each case," and "delineat[ed] progressive steps to be taken for certain types of cases," including "[u]nsatisfactory quality of work." 819 A.2d at 708. The Vermont Supreme Court found that notwithstanding disclaimers that any employment was at-will, the handbook was "at the very least ambiguous regarding employees' status[.]" *Id.* at 709; *see also Havill*, 783 A.2d at 428 ("Personnel policies that commit an employer to a progressive discipline system present a triable issue of fact on whether an employer may terminate an employee only for just cause.").

The Handbook at issue here states that "Shaw's/Star Market generally follows a progressive corrective action process that may include verbal and written warnings, suspension and/or separation of employment." (Doc. 32-10 at 25.) It, however, unambiguously qualifies this statement in the same paragraph by stating that "[i]n Shaw's/Star Market sole discretion, it may skip some or all of the steps in the progressive correction action process[.]" *Id.* It lists twenty-seven types of conduct that may warrant immediate discharge from employment, including a catch-all category of "[o]ther conduct which, based on the facts and circumstances, warrants immediate discharge." *Id.* at 26. It further states that "Shaw's/Star Market reserves the right to determine the appropriateness and level of counseling, or corrective action in each situation, including whether immediate termination of employment is warranted." *Id.* at 25. Although "[h]andbook provisions committing the employer to a progressive discipline system are sufficient for a jury to find that the employer may terminate the employee only for cause[,]" *Trombley v. Southwestern Vt. Med. Ctr.*, 738 A.2d 103, 108 (Vt. 1999), here, the plain language of the Handbook indicates that Defendant did not commit itself to using a system of progressive discipline in every case but rather reserved the right to use

12

progressive discipline at its discretion. The Handbook's language with regard to the use of progressive discipline is thus not "mandatory in tone." *Dillon*, 819 A.2d at 705.

Plaintiff points to no provision of the Handbook that entitled her to disciplinary treatment of which she was deprived. Because the Handbook unambiguously provided for at-will employment and did not provide mixed messages regarding progressive discipline, it did not create an implied contract of employment.

Plaintiff argues that Defendant's routine use of progressive discipline demonstrates the existence of an implied contract of employment, pointing to deposition testimony of Defendant's employees.[2] Plaintiff contends that these practices "instill a legitimate expectation of just-cause employment." (Doc. 34 at 5.) However, none of the statements that Plaintiff cites "evince [Defendant's] intent to bind itself" to particular corrective action steps. *Havill*, 783 A.2d at 428. An employer creates an implied contract of employment only where its policies are "clearly established and uniformly and consistently applied throughout the company." *Ross*, 665 A.2d at 585. Because Defendant did not have "definitive policies, which expressly or impliedly include a promise for specific treatment in specific situations[,]" Plaintiff remained an at-will employee. *Id.* at 584; *see also Dillon*, 819 A.2d at 710 ("Courts have generally required a promise of a specific and definite nature before holding an employer bound by it.").

The Handbook unequivocally states that the at-will employment relationship can only be modified by Defendant's Chief Executive Officer. (Doc. 32-10 at 5) ("Only the Chief Executive Officer of the Company has the authority to make an employment

---

[2] For example, Plaintiff claims that Ms. O'Reilly stated that corrective action is used in "all cases." (Doc. 34-7 at 14.) Ms. O'Reilly's testimony, however, is not clear on this point and her statement about "all cases" can be interpreted as indicating that Defendant's employees took guidance from Human Resources in "all cases." *Id.* Similarly, although Ms. Pollard testified that employees "receive coaching and verbal correction" and are given "quite a few written warnings before termination[,]" she did not indicate that this practice was followed in every case. (Doc. 34-8 at 28.) With regard to the corrective action policy, Ms. Gilson testified that "[i]t would depend on the situation, but normal practices would be a verbal or written warning, a final written warning with or without a suspension, and then . . . there may be a final suspension, and then termination." (Doc. 34-6 at 3.) Additionally, Mr. Fitzsimmons stated that employees of Defendant are not terminated for "no reason at all." (Doc. 34-11 at 14.)

13

agreement for anything other than employment at-will and then only in writing and signed by or duly authorized by the Chief Executive Officer.") The presence of this provision in the Handbook eliminates any claim that any other employee could modify the at-will relationship and provide Plaintiff with an "enforceable promise of specific treatment in a specific circumstance." *Ross*, 665 A.2d at 585; *see also Kuhl v. Wells Fargo Bank, N.A.*, 2012 WY 85, ¶ 22, 281 P.3d 716, 724 (holding that statements made by a human resource manager could not modify an at-will employment relationship where a letter from the employer to the plaintiff stated that only someone "at the level of executive vice president of higher" could modify the at-will employment relationship); *Meier v. Family Dollar Servs., Inc.*, 443 F. Supp. 2d 1036, 1051 (N.D. Iowa 2006) (holding that no employment contract existed where the employee handbook stated that only the president or chairman were authorized to create an employment contract through a separate signed writing). Plaintiff points to no evidence that created a contrary expectation. Finally, Plaintiff points to no verbal promises made during her employment that she would receive progressive discipline even if she touched a customer without his consent and even if that customer reported that touching as an assault.

### C. Whether Plaintiff's Termination Complied with Defendant's Handbook.

Defendant alternatively argues that even if an implied contract of employment existed between Plaintiff and Defendant, Plaintiff's termination complied with the disciplinary procedures set forth in the Handbook which states:

> Any behavior or action that threatens another person's safety . . . or causes them to perceive their safety . . . is threatened, will be thoroughly investigated and if confirmed, will not be tolerated.
>
> Any Team Member who, for any reason, . . . does something to threaten another person's safety . . . , even in jest, will be subject to corrective action up to and including discharge. Violations of this policy may result in immediate termination of employment without prior warnings.
>
> This policy applies to all statements and acts, even those that are not intended to be harmful[.] . . . This policy also applies to comments or acts that are directed at persons other than Company Team Members.

14

(Doc. 32-10 at 24.)

In this case, it is undisputed that Plaintiff touched Mr. Bowen without his consent and that Mr. Bowen reported this touching as an assault. Even if a reasonable person in Plaintiff's position might react in the same way, pursuant to Defendant's Handbook she was advised that such conduct "may result in immediate termination of employment without prior warnings." *Id.* Under such circumstances, no breach of contract occurs. *See Sullivan v. Cont'l Const. of Mont., LLC*, 2013 MT 106, ¶ 43, 370 Mont. 8, 17, 299 P.3d 832, 838 (holding that an employer did not violate provisions of its handbook where the handbook provided that the employer could "terminate employees immediately for a variety of misconduct[,]" including the types of activities for which the employer terminated the plaintiff's employment).

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment and DISMISSES Plaintiff's claim.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 1st day of April, 2019.

Christina Reiss, District Judge
United States District Court

15